UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| EQUITY PARTNERS HG, LLC; and HERITAGE GLOBAL PARTNERS, INC.; <br><br> Plaintiffs, <br><br> vs. <br><br> SAMSON, INC.;  BLACK EARTH, LLC; and KENNETH PRICE; <br><br> Defendants. | 5:18-CV-05006-JLV <br><br> REPORT AND RECOMMENDATION <br><br> PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT DOCKET 33 <br><br> DEFENDANT PRICE'S MOTION FOR SUMMARY JUDGMENT DOCKET 36 |

**INTRODUCTION**

This matter is pending before the court on the complaint of plaintiffs Equity Partners HG, LLC and Heritage Global Partners, Inc.  See Docket No. 1. Jurisdiction is premised on the diverse citizenship of the parties and an amount in controversy exceeding $75,000, 28 U.S.C. § 1332.  Both plaintiffs and defendant Kenneth Price have moved for summary judgment in each of their respective favors.  See Docket Nos. 33 & 36.  Both motions were referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Jeffrey L. Viken, Chief United States District Judge.  See Docket No. 49.

**FACTS**

Pursuant to local rules, each movant has filed a statement of undisputed material facts in support of their respective motions.  See DSD LR 56.1A.  The following recitation of facts is gleaned from the court's reconciliation of those

two statements and the supporting documents provided by both parties which supply the evidentiary bases for the same.

**A.    The Parties Meet**

Samson, Inc. ("Samson"), is a South Dakota corporation which previously was in the business of selling motorcycle exhaust and exhaust parts in Sturgis, South Dakota.  Black Earth LLC ("Black Earth") is a South Dakota limited liability corporation which owns the real property on which Samson operated its motorcycle exhaust business.  Kenneth Price is the CEO of Samson and the sole member of Black Earth.  Stanley Price, Kenneth's son, was the president of Samson.

On July 25, 2017, Stanley contacted plaintiff Heritage Global Partners, Inc. ("Heritage") regarding "an auction to liquidate all of my equipment in the near future."  Kenneth joined the conversation and stated that Samson's plan was "to sell the company through [plaintiffs'] network followed by an auction, if needed."  Heritage and plaintiff Equity Partners HG, LLC ("Equity") are subsidiaries of Heritage Global, Inc. which specialize in surplus and distressed asset transactions, specializing in selling businesses as going concerns and liquidation of assets.

**B.    The Agreement**

Discussions between the parties culminated in a written "Exclusive Marketing and Sale Agreement" ("Agreement") executed on August 8, 2017. See Docket No. 34-1.  Samson and Black Earth entered into the Agreement as "client" with Equity and Heritage. Id. at p. 1.  The purpose of the Agreement

was to have Heritage conduct a sale of Client's "Assets" and the compensation to be paid to Heritage for that service. Id. "Assets" was defined to include all personal property, intellectual property, accounts receivable, and real estate of the Clients' business. Id. at p. 8, Exhibit A.

The Agreement set forth a two-stage process. First, "[d]uring Phase 1, which will take place for up to sixty (60) days following the date of this Agreement, Equity Partners shall advertise and market the availability of the Assets for sale as a going concern to seek a sale(s) of all or a substantial portion or portions of the Assets in bulk (the "Entirety Sale")." Id. at p.1 ¶1. If an Entirety Sale did not come to fruition, or if an Entirety Sale left substantial assets unsold, then "Phase II shall commence, during which [Heritage] shall prepare and market the availability of the portion of the Assets consisting of machinery, equipment, inventory, related facility assets and other tangible personal property for sale, first in bulk and subsequently on a piecemeal basis, via public auction and conduct a private sale or public auction sale (the "Auction"), all of which shall take place within forty-five (45) to sixty (60) days following the conclusion of Phase 1, if necessary." Id.

The Agreement provided that, with regard to real property which was part of the Assets, Heritage would sell the property "in conjunction with a South Dakota-licensed real estate professional, if necessary, who shall be compensated solely by Heritage out of the compensation paid to Heritage hereunder." Id.

The Agreement provided that Heritage would be Client's "exclusive agent to advertise, market and sell the Assets." Id.  Furthermore, the Agreement stated "[t]he term of Heritage's exclusive rights shall begin as of the date that this Agreement is executed and shall continue for the greater of:  (i) one hundred twenty (120) days or (ii) as long as any prospect identified during the 120 days is under a letter of intent for any transaction regarding the Assets." Id.  All communications and inquiries regarding the Assets were to be directed to Heritage.  Id. at p.2, ¶3(a).

The Agreement prohibited the Clients from selling, withdrawing or disposing of any Assets other than through Heritage during the term of the Agreement.  Id. at pp.1-2, ¶1.  If Client did withdraw or sell Assets other than through Heritage (with the exception of inventory and accounts receivable in the ordinary course of business), the Agreement provided Client would be required to pay Heritage full compensation according to the Agreement.  Id.

The Agreement recited that Heritage would "be entitled to its fee regardless of who the buyer is or who brought them to the transaction." Id. at p.1, ¶1.  That fee, for an Entirety Sale, was specified to be the "greater of $100,000 or:  (i) 7% of the first $1,000,000 of aggregate gross sale proceeds, and (ii) 6% of those aggregate gross sale proceeds between $1,000,001 and $4,000,000 and (iii) 4% of those aggregate gross sale proceeds in excess of $4,000,000." Id. at p.3, ¶5(a).  In the event of an Auction sale, the successful bidders at the auction would pay Heritage's fee via an 18% "buyer's premium" added to the cost of the purchase price of the item.  Id. at ¶5(b).  The

4

Agreement provided that the Client would not be responsible for Heritage's fee for an Auction sale.  Id.

As to expenses, the Agreement provided that for an Entirety Sale, Heritage would prepare a budget for marketing, travel, advertising and labor for up to $20,000.  Id. at p. 3, ¶4.  For all expenses, Heritage agreed to front the costs, but Client agreed to reimburse Heritage for those costs out of the proceeds from the sale.  Id.  The Agreement specified it was covered by the law of the state in which Client's principal office was located—South Dakota.  Id. at p.6, ¶13.  Kenneth signed the agreement on behalf of both Samson and Black Earth.  Id. at p.7.

**C.    Interim Post-Agreement Activities by the Parties**

Immediately after executing the agreement, plaintiffs sought a buyer for the assets covered by the Agreement and submitted weekly reports to defendants detailing plaintiffs' efforts in this regard.  On September 18, 2017, plaintiffs sent defendants the sixth such weekly report setting forth communications with potential buyers.  The report recommended setting up a telephone call to discuss an auction and timeline.  The report indicated that once a formal auction timeline was established for piecemeal sale of assets, it may motivate the potential buyers who were interested in purchasing the business as a going concern to make an offer.

In response to the sixth weekly report of plaintiffs, Kenneth responded that he was interested in establishing an auction timeline.  Thereafter, the parties agreed upon an auction for November 8-9, 2017.

5

Plaintiffs continued to seek an entirety buyer while simultaneously preparing for the scheduled piecemeal auction. In this regard, plaintiffs retained Phil Robinson to inventory Samson's assets. Mr. Robinson was at Samson's facility on November 7, 2017, in preparation for the auction and the auction preview.

On November 3, 2017, plaintiffs contacted Kenneth and asked whether they should remove the bulk lot and/or inventory from Samson's facility. See Docket No. 34-2 at p.6 (depo. Kenneth Price p.86, lines 9-17). Kenneth responded "[n]ot yet. We may have a late buyer for the company." Id. (lines 20-25).

## D.    Sale of Samson to OnCourse

Unbeknownst to plaintiffs, prior to November 4, 2017, Kenneth had begun negotiations with Richard Whipp of OnCourse Capital, LLC ("OnCourse"), for the sale of Samson. On November 4, Mr. Whipp sent Kenneth a draft Asset Purchase Agreement via email for Kenneth's review. See Docket No. 34-11. Mr. Whipp told Kenneth he would be in Sturgis the next day (November 5) and was hopeful that the parties could close on the sale by the afternoon of November 7 ahead of the planned auction on November 8. Id.

On November 6, 2017, plaintiffs sent their 13th weekly report in which they indicated they were continuing their marketing efforts on behalf of Samson. See Docket No. 34-8 at p. 17. Plaintiffs stated they were "looking forward to this week's auction." Id. Then plaintiffs stated they understood potential buyers may be contacting defendants directly. Id. Plaintiffs "strongly

6

recommend[ed defendants] refer those prospects to Equity Partners, or at the least keep [plaintiffs] in the loop on any discussions you have with them." Id.

The source of plaintiffs' information appears to have been Phil Robinson who has provided a declaration in support of plaintiffs' summary judgment motion indicating Stanley had told him at an unspecified time prior to November 7 that Samson was in negotiations to be sold. See Docket No. 34-10 at p.1, ¶5. Robinson also stated he observed Kenneth meeting with potential buyers at the Samson facility. Id.

On November 7, while Phil Robinson was at Samson preparing for the auction, the president of Samson, Stanley Price, told Robinson that Samson had been sold and the auction should not proceed. Id. at ¶6. Mr. Robinson then observed Stanley pack up all his personal belongings and leave the Samson facility. Id. at ¶7. Mr. Robinson then relayed this information to plaintiffs. Id. at ¶8.

Defendants agree that Stanley told Robinson (erroneously according to defendants) that Samson had been sold, but deny that Stanley told Robinson to cancel the auction. Defendants assert that plaintiffs had already canceled the auction on November 6, 2017. See Docket No. 37-1 at p.3 (defendants' denial of a request to admit). This is not borne out by the evidence. Plaintiffs have produced evidence that they canceled the auction at 3:46 p.m. on November 7, 2017. See Docket No. 34-15 (email from plaintiffs to auctioneer canceling auction; email from auctioneer to staff telling them to notify auction registrants of the cancellation).

Furthermore, although defendants deny that Stanley told Robinson to cancel the auction, plaintiffs have supported their assertion with a declaration under oath from Robinson.  See Docket No. 34-10 at p. 2, ¶6.  Defendants have not countered plaintiffs' submission with an affidavit, deposition or other statement under oath from Stanley or anyone else establishing that Stanley did *not* say this.  See FED. R. CIV. P. 56(c)(1) & (4) (requiring parties to support assertions of fact with affidavits, declarations or other admissible evidence).  All defendants submit in support of their position is a denial of a request to admit that Stanley told plaintiffs the auction should be canceled, which denial is signed by defendants' lawyer.  See Docket No. 37-1 at p. 3.  A denial of a request to admit is not positive evidence of the obverse of the fact requested to be admitted.  See FED. R. CIV. P. 36.  Furthermore, defense *counsel*, who signed the denial, has no personal knowledge of the conversation between Robinson and Stanley on November 7, 2017, as required by Rule 56.  See FED. R. CIV. P. 56(c)(1) & (4).  Defendants' mere denial of a fact, without supporting affidavit, deposition, or other admissible documentary evidence does not suffice to counter plaintiffs' assertion of fact supported by declaration under oath.  Id. The court, therefore, takes as true plaintiffs' assertion that Stanley told Robinson the auction should be canceled.

At 1:44 p.m., plaintiffs sent a joint email to Kenneth and Stanley asking if they had sold the business.  See Docket No. 34-13 at p. 1.  No response to this email appears in the record.  Plaintiffs then apparently contacted Stanley directly.  After speaking to Stanley, plaintiffs sent an email to Kenneth at

3:05 p.m. on November 7 telling Kenneth that Stanley had "confirmed the company has been sold and that [plaintiffs] were to cancel tomorrow's auction." See Exhibit 34-14 at p. 3.  Plaintiffs congratulated Kenneth and indicated they wished to discuss the matter of plaintiffs' compensation.  Id.

At 3:46 p.m. on November 7, 2017, plaintiffs notified the auctioneer that the auction scheduled for the next day was canceled.  See Docket No. 34-15. At 4:50 p.m. the auctioneer asked its employees to notify the registrants for the auction that the auction was canceled.  Id.

Kenneth responded via email at 6:56 p.m. the same day and asked whether the next day's auction had been canceled.  Id. at pp. 2-3.  Plaintiffs confirmed the auction had been canceled.  Id. at p. 2.  Kenneth then stated he thought the auction would still take place despite the sale of Samson.  Id. Kenneth stated "[a]lthough the business *sold* [sic] doesn't mean there was not going to be equipment for sale."  Id. (emphasis added).

Plaintiffs asked to set up a phone call with Kenneth; Kenneth responded he was unavailable that day due to travel.  Id. at p. 2.  Plaintiffs offered to set up a phone call for the next day.  Id. at p.1.  Kenneth stated he would "see what [he could] do."  Id.  Later he stated he would "try to be available early next week."  Id.  Ultimately, Kenneth never did accept an invitation to talk to plaintiffs about what compensation they believed they were owed under the Agreement.  See Docket No. 34-2 at p. 9 (depo. Kenneth Price at p. 133, lines 10-25; p. 134, lines 1-25; p. 135, line 1).

During Phase 1 of the Agreement plaintiffs incurred $6,488.59 in expenses related to marketing Samson as a going concern. They incurred $17,364.44 in expenses preparing for the piecemeal auction.

Defendants characterize the sale to OnCourse as a sale of Samson's assets only, not the sale of Samson as a going business. See Docket No. 34-7 at pp. 1-2. However, the OnCourse agreement included a provision that required Kenneth and Stanley to assist OnCourse in continuing the business operations for two years after the sale. See Docket No. 34-2 at p. 10 (depo. Kenneth Price at p. 142, lines 5-25; p. 143, lines 1-6); see Docket No. 34-12 at pp. 3-4, ¶2(g). Kenneth testified he was ready and able to go to events, trade shows, share any knowledge he had about design and like subjects about which he was an expert pursuant to this provision of the OnCourse agreement. See Docket No. 34-2 at p. 10 (depo. Kenneth Price at p. 142, lines 5-25).[1]

The OnCourse agreement also required Samson to "use its reasonable best efforts to preserve intact the business organization and employees and other business relationships" of Samson. See Docket No. 34-12 at p. 4, ¶2(i) iv). Finally, Kenneth admitted in his deposition that all assets of Samson were sold except the accounts receivable. See Docket No. 43-1 at p.3 (depo.

---

[1] Ultimately, OnCourse never called upon Kenneth or Stanley to honor this provision of their agreement. As Kenneth termed it, "they just didn't need my help, . . . they basically bowed out from me and Stan. They were going to take that ball and run with it themselves. It kind of hurt my feelings a little bit . . ." See Docket No. 34-10 at p.10 (depo. Kenneth Price at p. 142, lines 23-25; p. 143, lines 2-4).

Kenneth Price at p. 98, lines 4-22).  The only other asset related to Samson that was *not* sold to OnCourse was the real estate held by Black Earth.

The sale of Samson to OnCourse was made in exchange for $1,000,000, which Kenneth received and kept personally. The proceeds of the sale were not rendered to Samson as an entity.  Black Earth never sold anything and continues to hold title to the real estate on which Samson was operating even today.  Black Earth has also not received any of the sale proceeds from OnCourse.

**E.     The Parties' Claims in this Lawsuit**

Plaintiffs filed their complaint in this court January 26, 2018.  See Docket No. 1.  They allege breach of contract against both Samson and Black Earth.  Id. at p.5.  Plaintiffs also allege a claim for unjust enrichment against both Samson and Black Earth.  Id.  Against Kenneth Price plaintiffs assert a claim for tortious interference with contract.  Id. at pp.5-6.  In response to plaintiffs' complaint, defendants Samson, Black Earth and Kenneth asserted a counterclaim against plaintiffs for breach of contract, asserting plaintiffs "unilaterally canceled the auction" despite undertaking a contractual obligation to conduct said auction.  See Docket No. 21 at pp.3-4.

Plaintiffs now move for summary judgment in their favor on all of their own claims and on defendants' counterclaim.  See Docket No. 33.  Defendant Kenneth Price alone has moved for summary judgment in his favor on plaintiffs' tortious interference with contract claim.  See Docket No. 36.  Both parties oppose the others' respective motions.  See Docket Nos. 40 & 44.

11

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

12

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. <u>Anderson</u>, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." <u>Id.</u> (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Id.</u> at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250.

The mere fact that opposing parties have filed cross-motions for summary judgment does not necessarily mean that no genuine dispute of a material fact exists; nor do cross-motions constitute a stipulation to the court's disposition of the case by motion.  <u>Wermager v. Cormorant Twp. Bd.</u>, 716 F.2d 1211, 1214 (8th Cir. 1983); <u>Barnes v. Fleet Nat'l. Bank</u>, 370 F.3d 164, 170 (1st. Cir. 2004).  Rather, cross-motions require the court to evaluate each motion independently and determine whether that movant is entitled to judgment as a

matter of law.  <u>C. Line, Inc. v. City of Davenport</u>, 957 F. Supp. 2d 1012, 1024-25 (S.D. Iowa 2013); <u>St. Luke's Methodist Hosp. v. Thompson</u>, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

## B.    Summary Judgment Against Black Earth

In response to plaintiffs' motion for summary judgment, defendant Black Earth argued that it never sold the sole asset it owns which was subject to the Agreement—the real estate on which Samson operated its business.  Black Earth argues that not only did it not sell the real estate to OnCourse as part of the transaction between OnCourse and Samson, but Black Earth continues to own the real estate that was subject to the Agreement to this day. Furthermore, plaintiffs allege and defendants do not dispute that Kenneth Price received all the proceeds from the sale of Samson to OnCourse.  Therefore, Black Earth received none of the proceeds of the sale.

In their reply brief, plaintiffs do not address this argument.  The court finds Black Earth's position to be justified.  Accordingly, the court recommends that plaintiffs' motion for summary judgment against Black Earth on plaintiffs' claims of breach of contract and unjust enrichment be denied.  The court notes Black Earth did not move for summary judgment in its own favor on plaintiffs' breach of contract claim against Black Earth.  Therefore, judgment should not issue at this time in favor of Black Earth or plaintiffs on claims involving Black Earth.

**C.    Defendants' Counterclaim Against Plaintiffs**

Plaintiffs' motion encompasses a request that judgment in their favor be entered on defendants' breach of contract counterclaim.  To reiterate, that claim asserts that plaintiffs themselves breached the Agreement by canceling the piecemeal auction.  Plaintiffs assert in their reply brief that defendants never addressed this aspect of their motion for summary judgment, thereby conceding that the counterclaim should be dismissed.

The court disagrees.  Defendants vigorously oppose plaintiffs' summary judgment by arguing that *plaintiffs* themselves materially breached the contract first before Samson and Kenneth ever consummated the sale of Samson to OnCourse.  Because one party's material breach of a contract excuses the other party's performance, Samson and Kenneth argue they cannot be held liable for breach of contract or unjust enrichment where plaintiffs were guilty of materially breaching the contract first.  The court finds this argument equally applicable to plaintiffs' affirmative claims against defendants as well as applicable to plaintiffs' motion for summary judgment on the counterclaim.  Therefore, the court declines to find that defendants defaulted on defending their counterclaim.

**D.    Breach of Contract Claim Against Samson and Defendants' Counterclaim**

    **1.    Liability**

In this diversity action, the substantive law of the state of South Dakota applies and federal law as to procedure applies.  See <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938); <u>In re Baycol Products Litigation</u>, 616 F.3d

778, 785 (8th Cir. 2010). To prevail on their breach of contract claim, plaintiffs must show (1) an enforceable promise; (2) that defendants breached that promise; and (3) they suffered damages as a result of defendants' breach. See Guthmiller v. Deloitte & Touche, LLP, 699 N.W. 493, 498 (S.D. 2005). Neither party disputes that, under South Dakota law, there was a valid and enforceable contract created by the Agreement. Each party asserts the other party materially breached the Agreement first, thereby excusing the non-breaching party's performance.

Under South Dakota law, a material breach of a contract by one party excuses the non-breaching party from further performance under the contract—unless the contract itself provides otherwise. FB & I Bldg. Products, Inc. v. Superior Truss & Components, a Div. of Banks Lumber, Inc., 727 N.W.2d 474, 478-89 (S.D. 2007). The Agreement between the parties in this case does not provide otherwise. See Docket No. 34-1.

No one disputes that Stanley Price told Mr. Robinson, who then told plaintiffs, that Samson had been sold. As discussed above, though defendants assert a bald denial that Stanley told plaintiffs they were to cancel the auction, they have not supported that denial with admissible evidence, while plaintiffs have supported their assertion of fact. The court takes it as proven for purposes of plaintiffs' motion that, when Stanley told Robinson Samson had been sold, he also told Robinson the auction should be canceled.

Plaintiffs argue that Samson's sale without going through plaintiffs was a material breach of the contract. This material breach by defendants, plaintiffs

16

argue, acted to excuse plaintiffs' performance under the contract.  After defendants breached the contract, plaintiffs argue their duty to actually hold the piecemeal auction was either moot altogether because there were no assets left to sell piecemeal, or at the very least plaintiffs' duty under the contract to hold the auction was excused.

Defendants argue that Samson was not actually sold until Kenneth put "ink to paper" and signed the agreement with OnCourse.  Defendants posit that Stanley misspoke when he said the company had been sold as it had not yet actually been sold at the time he made his statement.  Defendants coyly do not offer up the time of the day on November 7, 2017, Kenneth signed the OnCourse sale agreement, however.[2]

As the parties argue their respective positions, the question framed is whether the agreement with OnCourse was executed first or the auction was canceled first.  There is circumstantial evidence showing the sale of Samson to OnCourse took place first.

The sales agreement between Samson and OnCourse provided that OnCourse would have the right to determine which assets would be "sold at the upcoming auction on Wednesday, November 8, 2017, and Thursday, November 9, 2017, or a later date if the auction date is extended."  See Docket No. 34-2 at

---

[2] Neither party submits any direct evidence of when on November 7 the OnCourse agreement was signed.  Lawyers for both Kenneth and OnCourse were involved in drafting the written agreement, so one would think their time records might shed some light on the issue.  Alternatively, Mr. Whipp, Kenneth, or Stanley might have a recollection that could be attested to.  None of these sources of evidence appear in the record.

p. 7 (depo. of Kenneth Price at p. 94, lines 9-25; p. 95, lines 1-15).  If plaintiffs had already canceled the auction, the OnCourse sales agreement would not have referenced it as an "upcoming auction on . . . November 8. . . and 9."  In addition, Kenneth Price wrote to plaintiffs at 6:56 p.m. on November 7 and himself represented that Samson had been "sold."  See Docket No. 34-14 at p.2.

    Ultimately, though, the exact time of the OnCourse sale in relation to the cancelation of the auction does not matter.  If the OnCourse sale took place before Stanley made his statement to Robinson, then Stanley's statement was true and accurate in all respects.  It was also a material breach of the contract, excusing plaintiffs' further performance under the contract.  If Stanley's statement was true, plaintiffs were entitled to cancel the auction.  In addition, the only assets from the Agreement between plaintiffs and defendants that were left to be sold at auction after the OnCourse sale were Samson's accounts receivable and Black Earth's real estate.[3]  All equipment within Samson's building was sold to OnCourse.  See Docket No. 43-1.  The reason for holding the auction, therefore, had become moot.

    Alternatively, if Stanley "misspoke" by saying that Samson had sold because Stanley and Kenneth had not yet signed the OnCourse agreement, nevertheless plaintiffs' actions in canceling the auction were justified.  Stanley was the president of Samson and the son of the CEO of Samson.  Plaintiffs

[3] OnCourse did not assume Samson's liabilities, but then a corporation's liabilities would not have been something auctioned off at the sale in any event.

were entitled to rely on Stanley's statements as an agent of Samson acting within the scope of his authority with Samson.  <u>Kirlin v. Halverson</u>, 758 N.W.2d 436, 444 (S.D. 2008).  Therefore, if Stanley acted wrongfully, Samson is nevertheless liable for his acts and plaintiffs' reliance thereon.  <u>Id.</u>  Based on this analysis, summary judgment should enter in favor of plaintiffs on their own breach of contract claim against Samson and in favor of plaintiffs on defendants' counterclaim for breach of contract.

Plaintiffs concede that if they succeed in obtaining judgment in their favor on the contract, the unjust enrichment claim becomes superfluous.  <u>See</u> Docket No. 35 at p.5 n.3.  Therefore, the court does not recommend granting plaintiffs summary judgment on the unjust enrichment claim.  However, defendants have not moved for summary judgment in *their* favor on that claim, so judgment should not be entered on defendants' behalf on the unjust enrichment claim.

### 2.    Contract Damages

Plaintiffs request judgment in the amount of $123,853.03 in damages, plus pre- and post-judgment interest.  That figure is calculated as follows:

$100,000.00 commission from the OnCourse sale

$    6,488.59 in expenses for marketing Samson as a going concern

$  17,364.44 in expenses preparing for the piecemeal auction

**$123,853.03 TOTAL**

Defendants seemingly argue that plaintiffs should take nothing, even if Samson breached the agreement.  They argue that plaintiffs are not entitled to

a commission for sale of the business as a going concern because it was not sold as a going concern, it was simply an "asset sale." They also argue that the Agreement set forth two separate, non-overlapping Phases—Phase 1 and Phase 2. If the sale of Samson as a going concern did not take place during Phase 1, defendants argue plaintiffs are not entitled to a commission. Phase 1 ended, according to defendants, prior to the November 7 OnCourse sale. Therefore, defendants argue they do not owe plaintiffs a commission for that sale. Instead, defendants argue the Agreement provides plaintiffs must obtain their fee, if any, from successful bidders at the auction.

Secondly, defendants argue that for expenses related to the sale of Samson as a going concern, plaintiffs were only entitled to "make a budget" for such expenses. Defendants argue this does not contemplate that plaintiffs would actually get reimbursed for those expenses within the budget.

Finally, defendants argue plaintiffs are not entitled to expenses from them in association with the piecemeal auction as the Agreement provides plaintiffs would recoup those expenses from the successful bidders at the auction and defendants would not be responsible for them. The court addresses each of these arguments in turn.

### a.     Rules of Contract Interpretation in South Dakota

Under South Dakota law, contract interpretation is a question of law. Cornelius v. Nat'l Cas. Co., 813 N.W.2d 167, 169 (S.D. 2012). When interpreting a contract, "effect will be given to the plain meaning of its words." In re Dissolution of Midnight Star, 724 N.W.2d 334, 337 (S.D. 2006). Courts

20

must "give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation." Id. (internal citation omitted). When provisions of a contract conflict, the more specific provision controls the more general provision. Spiska Eng'g, Inc. v. SPM Thermo-Shield, Inc., 730 N.W.2d 638, 645 (S.D. 2007). Courts look "to the language that the parties used in the contract to determine their intention." Pauley v. Simonson, 2006 S.D. 73, ¶ 8, 720 N.W.2d 665, 667-68. If the language of the contract is clear and unambiguous "it is the duty of [the] Court to declare and enforce it." Pauley, 720 N.W.2d at 668.

However, if the contract is ambiguous, then "parol and extrinsic evidence may be utilized 'to show what [the parties] meant by what they said . . .' " Id. (quoting Jensen v. Pure Plant Food Internatl., Ltd., 274 N.W.2d 261, 264 (S.D. 1979)). A contract "is ambiguous when it is fairly susceptible to two constructions." Fall River Co. v. South Dakota Public Assur. Alliance, 2001 S.D. 40, ¶ 6, 623 N.W.2d 735, 737. If a contract is ambiguous, it is construed against the scrivner. Ass Kickin Ranch, LLC, 2012 S.D. 73, ¶ 9; 822 N.W.2d at 727; Pete Lien & Sons, Inc. v. First American Title Ins., Co., 478 N.W.2d 824, 827 (S.D. 1991). Where there is no ambiguity, however, a contract is construed according to the plain and ordinary meaning of its words. Pete Lien & Sons, Inc., 478 N.W.2d at 827.

21

### b.    Commission

#### i.    Entirety Sale vs. Asset Sale

Plaintiffs base their claim for a commission on the fact that Samson was sold as a going business.  The Agreement provides that "[w]ith respect to all sales or lease of Assets consummated during or as a result of the Entirety Sale, Client shall pay Heritage a commission . . . equal to the greater of $100,000 or 7% of the first $1,000,000 of aggregate gross sale proceeds."  See Docket No. 34-1 at p. 3, ¶5(a)(i).  The first question presented by plaintiffs' position is whether the sale to OnCourse was an "Entirety Sale" under the Agreement.

The Agreement defines "Entirety Sale" to mean "all or a substantial portion of the Assets in bulk."  Id. at p. 1, ¶1.  "Assets" are also a defined term under the Agreement meaning "[a]ll machinery, equipment, tooling, accessories, facility assets and related tangible personal property, inventory, raw materials, work in process, intellectual property, accounts receivable and all other assets.  That certain parcel or parcels of real property and improvements constituting Seller's premises commonly known as 1151 Industry Rd., Sturgis, South Dakota. 57785."  Id. at p. 8.

As discussed above, everything within this definition of "Assets" was sold to OnCourse except the accounts receivables and the real property.  Furthermore, the Agreement does not require a sale of all assets before a sale qualifies as an "Entirety Sale."  Rather, the Agreement requires the sale of "substantially all" of the Assets in one fell swoop—"in bulk."  That is exactly what happened here.  OnCharge bought "substantially all" of Samson's assets

22

in one transaction.  The court finds this fits exactly within the meaning of an "Entirety Sale" for purposes of the Agreement and, specifically, for purposes of the commission paragraph 5(a).  Also, the Agreement set forth the fact that plaintiffs had exclusive rights to sell the Assets for a period of 120 days from the date of the execution of the Agreement (August 8, 2017), and that plaintiffs were entitled to their fee regardless of who the buyer was or who brought the buyer to the transaction.  See Docket No. 34-1 at p.1, ¶1.  There is no ambiguity in the Agreement on this score.

### ii.    Exclusivity of Phase 1 and 2

But defendants argue that Phase 1 and Phase 2 of the Agreement were distinct periods, with an Entirety Sale possible only during Phase 1. Defendants argue that at the time the OnCourse sale took place, Phase 1 was complete and Phase 2 had started.  Since the commission on an Entirety Sale is only possible during Phase 1, according to defendants' interpretation, and since Phase 1 had concluded, defendants argue plaintiffs are not entitled to their commission.  Defendants point out that, during a piecemeal auction or Phase 2, plaintiffs agree to collect their fee from successful bidders at the auction.  Therefore, defendants argue the Agreement specifically excludes them as the source of the payment of plaintiffs' fee in the event of an auction.

Paragraph one of the Agreement does appear to support defendants' interpretation in that it describes two separate Phases, with Phase 2 not beginning until Phase 1 was concluded.  Phase 1 entailed plaintiffs attempting to conclude an Entirety Sale while Phase 2 entailed plaintiffs pursuing

23

disposition of the assets at a piecemeal auction.  See Docket No. 34-1 at p.1, ¶1.  However, the court does not read this provision in isolation, but rather reads the provision in the context of the Agreement as a whole.  In re Dissolution of Midnight Star, 724 N.W.2d at 337.  Reading the Agreement as a whole, it is clear that plaintiffs are entitled to a commission under paragraph 5(a) if an Entirety Sale takes place.  This conclusion is buttressed by the 120-day exclusivity period granted to plaintiffs and the explicit statement that plaintiffs would be entitled to their fee if a sale took place during any portion of the 120-day period, regardless of the identity of the buyer or who brought the buyer to the transaction.  Id.

The Agreement also provides that defendants "desire[] to sell, lease or otherwise dispose of all the assets constituting its business (the "Assets") as a going concern or, if a going concern buyer is not located timely, to sell the Assets . . . either in bulk or in peacemeal [sic] fashion via public auction in order to maximize the value of such Assets, . . ."  See Docket No. 34-1 at p.1.  This provision also lends support to a looser time frame for obtaining an Entirety Sale than the black-and-white, Phase1-Phase 2 interpretation asserted by defendants.  An Entirety Sale will only be abandoned if an Entirety buyer is not "timely" located, and even in that event, an Entirety Sale was still possible at auction if Samson's assets were sold "in bulk" at the auction.  Id.

In addition, the Agreement provides that plaintiffs will "[r]ecommend to Client the appropriate time to commence the Auction phase of the Sale."  See Docket No. 34-1 at p.2, ¶2(h).  This provision belies defendants' interpretation

24

that Phase 1 was strictly and only for the first 60 days of the contract after which Phase 1 automatically ended and the Auction phase, Phase 2, began. Id. If the two phases were as black-and-white as defendants contend and mutually exclusive to boot, there would be no need for plaintiffs to "recommend" to defendants when to begin Phase 2. Instead, Phase 2 would begin automatically simply by virtue of the passage of 60 days without an Entirety Sale materializing. That was quite obviously not the intent of the Agreement. The court concludes the Agreement provided a commission for plaintiffs under paragraph 5(a) if an Entirety Sale was concluded at any time within the 120-day exclusive period, not just during the first 60 days following August 8, 2017.

### iii.    Modification by Mutual Consent

Furthermore, even if defendants' interpretation of the original Agreement were accurate, parties are free to modify their contracts by mutual consent after they have been entered into. Ahlers Bldg. Supply, Inc. v. Larsen, 535 N.W.2d 431, 434-35 (S.D. 1995). Here, even if the contract is susceptible of defendants' interpretation, the parties clearly mutually agreed to modify the contract.

On September 11, 2017, plaintiffs notified defendants they had four named groups actively looking at purchasing Samson as a going business. See Docket No. 34-8 at p. 9. Plaintiffs informed defendants they would attempt to arrange site visits with each of the four potential buyers for the next week. Id. Plaintiffs further explained that if no site visits materialized, it was plaintiffs' experience that establishing a timeline for a piecemeal auction could often

25

motivate buyers who were interested in purchasing the business as a going concern to make an offer.  Id.  Plaintiffs also explained that even if an auction took place, one of the options available to bidders at the auction would be to purchase Samson as an Entirety.  Id.

The next week, on September 18, 2017, plaintiffs gave further details about the four groups.  Id. at p. 10.  Plaintiffs suggested a conference call to discuss a timeline for a piecemeal auction as a strategy to motivate the potential Entirety buyers to take action.  Id.  Kenneth responded with an email to plaintiffs telling when he was available for the suggested telephone conference.  See Docket No. 34-9 at p. 3.  Kenneth expressed a preference for an Entirety sale, but agreed a liquidation auction would be acceptable.  Id. Thereafter, plaintiffs sent defendants a suggested timeline for the auction and marketing efforts associated with the auction.  Id. at p. 1.  Kenneth agreed to the timeline.  Id.

A conference call was held on Wednesday, September 20, 2017, at noon Eastern Time to discuss the timeline.  See Docket No. 34-8 at p. 11.  A written recap of the telephone discussion restated the timeline for the auction and confirmed that plaintiffs would continue to try to obtain a buyer for an Entirety Sale while at the same time preparing for a piecemeal auction in the event no Entirety Sale was concluded.  Id.

Thereafter, plaintiffs reported to defendants about a potential Entirety Sale buyer and arranged for the buyer to come to Sturgis to tour the Samson facility.  Id. at p. 12.  The buyer did in fact tour Samson and was very

26

impressed. <u>Id.</u> at p. 13. Plaintiffs informed defendants they would follow up with this buyer in "an effort to spur him to make an offer for the company as a going concern." <u>Id.</u> Discussions with this buyer continued into the next week. <u>Id.</u> at p. 14. As of October 23, 2017, this potential Entirety buyer was still discussing the matter with plaintiffs. <u>Id.</u> at p. 15. In addition, plaintiffs reported to defendants regarding three other potential Entirety buyers who were still discussing a possible purchase with plaintiffs. <u>Id.</u> Plaintiffs continued efforts to market Samson as a going concern right up to the eve of the auction. <u>Id.</u> at p. 16.

It is clear from this sequence of events that both parties mutually assented to an overlap of Phase 1 and Phase 2 such that plaintiffs would continue to market Samson as a going business—Kenneth's professed preference—while at the same time preparing for and advertising a piecemeal auction. The parties agreed upon this strategy both as a way to spur potential Entirety buyers to action and as a "plan B" to liquidate Samson in the event no Entirety Sale materialized. Therefore, the court holds in the alternative that if the Agreement is susceptible to defendants' interpretation regarding the exclusivity of Phases 1 and 2, the parties mutually agreed to a modification of the Agreement such that Phase 1 and 2 would overlap. Therefore, under either interpretation of the Agreement, plaintiffs are still entitled to their commission on the Entirety Sale to OnCourse.

Finally, the court notes that defendants were in violation of the agreement when they failed to refer OnCourse to plaintiffs and route the sale

through plaintiffs.  See Docket No. 34-1 at p.2, ¶3(a).  In the event defendants

sold Samson or its assets without going through plaintiffs as required by the

Agreement, the Agreement provided that defendants "shall be subject to full

compensation to [plaintiffs] pursuant to this Agreement."  See Docket No. 34-1

at p.2, ¶1.  This, also, supports the court's conclusion that plaintiffs are

entitled to their $100,000 commission on the Entirety Sale of Samson to

OnCourse.

### c.    Expenses

Defendants argue plaintiffs are not entitled to their expenses in relation

to marketing Samson as a going concern because the Agreement only allows

them to "make a budget."  The entire provision for expenses is as follows:

> 4.  EXPENSES.  [plaintiffs] will prepare a budget for advertising,
> marketing, travel, labor and miscellaneous relating to the
> preparation of the Assets and the marketing and conduct of the
> Sale, which shall not exceed $20,000 for the Entirety Sale phase.
> If the Auction phase is necessary, Client shall reimburse [plaintiffs]
> from the proceeds for all sums incurred for marketing and
> advertising, labor, travel and sustenance and miscellaneous
> expenses incurred with respect to the Auction Phase.  *All expenses*
> shall be advanced by [plaintiffs] and reimbursed by Client to
> [plaintiffs] directly as a deduction from the net proceeds otherwise
> payable to Client on a dollar for dollar basis upon presentation of
> proper documentation of such expenses.

See Docket No. 34-1 at p.3, ¶4 (emphasis added).

The last sentence of paragraph 4 of the Agreement clearly provides that

defendants are responsible for *all expenses* during both the Entirety and

Auction phases of the Agreement.  Id.  In all cases, plaintiffs agreed to pay the

expenses up front ("advance" the expenses), and defendants agreed to

reimburse plaintiffs for those expenses from the net proceeds of the sale.  Id.

The first sentence concerning the "budget" for $20,000 merely places a cap on plaintiffs' expenses for marketing during the Entirety phase.  Id.

Defendants' suggested interpretation would be meaningless:  if all plaintiffs were allowed to do was create a budget with no prospect of getting reimbursed, why would they create a budget in the first place?  Under defendant's interpretation, plaintiffs would be "stuck" with the expenses in any event, so any spending limit (i.e. the $20,000 cap), would be a cap plaintiffs enforced against themselves.  The court will not adopt a nonsensical interpretation of the contract.  "All" means "all."

Plaintiffs' requested expenses for the Entirety phase are well below the $20,000 cap ($6,488.69), so plaintiffs are entitled to be reimbursed for those expenses.  In addition, there is no cap for expenses associated with the Auction phase of the Agreement.  Although plaintiffs' *fee* in the event of an Auction was required to be paid by the successful Auction bidders, the same is not true for *expenses.*  As indicated above, the Agreement obligated defendants reimburse plaintiffs for all expenses from both stages of the contract, so long as plaintiffs' marketing expenses on the entirety sale did not exceed $20,000.  Under the plain language of the Agreement, plaintiffs are entitled to be reimbursed for those expenses by defendants.  The court recommends granting plaintiffs' motion for summary judgment in their favor on their breach of contract claim against Samson and granting the damages plaintiffs request.

**E.    Tortious Interference with Contract**

Plaintiffs also move for summary judgment in their favor on their claim against Kenneth Price for tortious interference with contract.  Defendant Kenneth Price cross-moves for summary judgment on this claim in his favor. Plaintiffs' theory is that Kenneth, through his tortious actions, induced Samson to breach its Agreement with plaintiffs, thereby damaging plaintiffs. Kenneth argues that he cannot be held liable as a matter of law for tortious interference where he was a corporate officer of Samson (CEO) and plaintiffs have failed to plead and prove that he acted outside the scope of his corporate agency with Samson.

In theory, the tort of tortious interference with contract can be recognized in South Dakota where the tortious interferer is an employee or officer of a the corporation which was induced to breach its contract.  Gruhlke v. Sioux Empire Fed. Credit Union, 756 N.W.2d 399, 405 (S.D. 2008).  But, as the Gruhlke court stated, the purpose of the tort is to provide "a remedy for contracting parties against interference from outside meddlers."  Id. at 404. Therefore, the tort requires plaintiff to demonstrate "a triangle—a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the contractual relations."  Id. (cleaned up).  The Gruhlke case came to the court on an appeal of a Rule 12 motion to dismiss for failure to state a claim.  Id.  Thus, the court's focus was on the plaintiff's pleading in her complaint.  Id. at 408-09.  Here, because the parties' motion is for

30

summary judgment, not dismissal under Rule 12, the court focuses on the evidentiary record.

The South Dakota Supreme Court concluded a tortious interference claim could be maintained against a corporate officer who interferes in a corporation's contractual relations with another if the corporate officer was acting "wholly outside the scope of employment, and . . . acts through improper means or for an improper purpose." Id. at 405. However, the court cautioned judicial vigilance over such claims. Id. Pertinent to the context of this case, the court stated judicial vigilance was necessary so as not to "chill the advantages of corporate formation." Id. Allowing tortious interference claims against corporate officers acting within the scope of their authority "would be a dangerous doctrine" according to the Gruhlke court. Id.

Recognizing that allowing the tort against a corporate officer could eclipse established law, the court placed a "heavy burden" on plaintiffs asserting the claim. Id. To that end, the court required plaintiffs asserting a tortious interference claim in this context to plead and prove: (1) the existence of a valid contractual relationship, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means for an improper purpose, (5) a causal effect between the interference and damage to the relationship, and (6) damages. Id. at 406. Defendants' argument focuses primarily on the third and fourth of these elements.

In order to show a corporate officer is a "third party" within the meaning of element three above, the court stated a corporation cannot contractually

31

interfere with itself.  Id.  Therefore, plaintiff must show the tortfeasor acted outside the scope of his agency.  Id. at 407.  If the tortfeasor's actions were connected directly or indirectly with the corporation's business, then the act was within the scope of corporate agency.  Id.  In making this determination, courts are to consider (1) whether the agent's acts occurred substantially within the time and space limits (if any) of his agency, (2) were his actions motivated at least partially by a desire to serve the corporation, and (3) were the actions the kind of actions the officer was hired to perform.  Id.  If the tortfeasor's actions were motivated even in part by a purpose to serve the corporation, then the actions were not of a "third party."  Id.

Here, there were no time and space limits on Kenneth's agency for Samson.  Samson was a corporation he started, according to his deposition. He operated it along with his son, Stanley.  The two of them were Samson in a very real sense.  Kenneth was not a standard employee with office hours when he was "on duty" or other hours when he was "off duty."

His actions were motivated at least partially by a desire to serve the corporation.  Asked at his deposition why he did not refer OnCourse to plaintiffs when OnCourse expressed interest in buying Samson, Kenneth said the following:

> Let me put it this way:  If somebody comes to me and says, "Hey, I think I'd like to buy something," and I say, "Oh, no, don't talk to me about it.  You go talk to somebody else," well, that kind of just kills the sale.  That's not being very friendly. . . . Especially if you're supposed to be there as a consultant or to make sure there's a smooth transition for a year or two after the sale.  I'm not going to be combative. I want to be cordial and helpful.  For me to be cordial and helpful, that means I need to talk to people.  And I'm a

32

> big boy, I can do that. . . . I understand [plaintiffs'] position, but I
> couldn't report every single time somebody happened to come up
> and talk to me about the purchase of Samson.

See Docket No. 34-2 at p. 8 (depo. Kenneth Price at p. 118, lines 13-25; p. 119, lines 1-3).  Again at his deposition, Kenneth was asked once he and OnCourse had agreed on a purchase price for Sansom, why Kenneth had not referred OnCourse to Samson at that point.  Id. (depo. at p. 119, lines 4-6).  Kenneth had no answer to that query.  Id. (depo. at p. 119, line 7).

This passage reveals Kenneth's primary aim in bringing OnCourse along, talking to them himself instead of referring them to plaintiffs, was to try to market the sale of Samson.  Kenneth felt it would be off-putting, especially coming from one who was supposed to be a post-sale consultant, to say to OnCourse that he had no authority to talk to OnCourse.

Of course, human nature being what it is, one can surmise that Kenneth was also motived by self-interest.  By handling the sale himself, he probably hoped to pocket the entirety of the sales proceeds and cut plaintiffs out of any commission.  Indeed, after the sale, he personally retained the proceeds of the sale.  But Gruhlke requires plaintiffs to show that Kenneth was motived exclusively by non-corporate interests.  Gruhlke, 756 N.W.2d at 407.  If Kenneth was motivated even partially by a desire to further the interests of Samson, then his actions do not qualify as those of a third party.  Id.  The court concludes plaintiffs' evidence fails to sustain the third necessary element of a tortious interference claim.  See also Mueller v. Cedar Shore Resort, Inc., 643 N.W.2d 56, 68-69 (S.D. 2002) (holding plaintiffs failed to show corporate

directors were "third parties" for tortious interference claim were all defendants' actions were done in their capacities as corporate directors).

In order to show the fourth element—improper means for an improper purpose—the court stated seven factors should be considered:  (a) nature of the tortfeasor's actions, (b) his motive, (c) the third party's interests with which the tortfeasor interfered, (d) interests the tortfeasor was trying to advance, (e) societal interests of both the tortfeasor and the plaintiff, (f) the proximity or remoteness between the breach of contract and the tortfeasor's actions, and (g) the relations between the parties.  Id. at 408.  Again, the burden is on the plaintiff to prove improper means or purpose.  Id.  Plaintiffs do not address these factors at all.

Plaintiffs focus exclusively on the fact that Kenneth personally pocketed the proceeds of the OnCourse sale himself instead of rendering those proceeds to Samson.  But this is not sufficient to prove "third party" and "improper motive" under the law outlined above.  The court concludes plaintiffs have failed to sustain their claim of tortious interference with contract against Kenneth Price individually.  Accordingly, as to this claim, the court recommends plaintiffs' motion be denied and Kenneth's motion be granted.

## CONCLUSION

Based on the foregoing facts, law and analysis, the court recommends:

1.      granting in part and denying in part plaintiffs' motion for summary judgment [Docket No. 33] as follows:

34

   a.  Granting summary judgment in favor of plaintiffs and against Samson on plaintiffs' breach of contract claim;

   b.  Granting summary judgment in favor of plaintiffs on defendants' counterclaim; and

   c.  Denying plaintiffs' motion on all other claims.

2.   Granting defendant Kenneth Price's motion for summary judgment [Docket No. 36] wholly and dismissing defendant Kenneth Price from this lawsuit.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED December 9, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

35